UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 10-12032-RGS

THOMAS BREEN

v.

SANTANDER GLOBAL FACILITIES, formerly known as SOVEREIGN BANCORP INC., SOVEREIGN BANCORP INC. DISABILITY PLAN,[1] and LIBERTY MUTUAL ASSURANCE COMPANY OF BOSTON[2]

MEMORANDUM AND ORDER ON
THE PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT

May 22, 2012

STEARNS, D.J.

This action is brought by plaintiff Thomas Breen under section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132. Breen seeks review of defendant Liberty Life Assurance Company of Boston's denial of his request for benefits under a long-term disability (LTD) insurance policy sponsored by his former employer, Sovereign Bancorp Inc. Having undertaken limited discovery, the parties now cross-move for summary judgment.

---

[1] Santander Global Facilities, formerly known as Sovereign Bancorp Inc., and Sovereign Bancorp Inc. Disability Plan, have been previously dismissed from this case.

[2] Liberty was incorrectly identified in the original case caption. Its correct name is Liberty Life Assurance Company of Boston.

# FACTUAL BACKGROUND[3]

In 1989, Breen sustained a work-related back injury. Since the injury, Breen has intermittently suffered lower back pain, bilateral buttocks pain, and numbness in his right thigh with calf spasms and tingling in his toes.

On June 27, 2007, Breen began working full-time as a Wealth Management Advisor for Sovereign. As part of his employment package, Breen was offered coverage under a group LTD insurance plan issued by Liberty (the Policy). Under the terms of the Policy, Breen became eligible for LTD coverage beginning on August 1, 2007. The Policy, however, contained a preexisting conditions provision, which stated as follows.

> This policy will not cover any Disability or Partial Disability:
>
> 1. which is caused or contributed to by, or results from a Pre-Existing Condition; and
>
> 2. which begins in the first 12 months immediately after the Covered Person's effective date of coverage.
>
> "Pre-Existing Condition" means a condition resulting from an Injury or Sickness for which the Covered Person is diagnosed or received Treatment within three months prior to the Covered Person's effective date of coverage.

AR00031.

---

[3] The parties jointly submitted an Agreed-to Record (AR).

On July 9, 2007, before the LTD coverage took effect, Breen consulted with Dr. Dennis Ivill after a "flare up" of his back pain, and was given two anti-inflammatory injections. Dr. Ivill's impression was that Breen had multiple lumbar disk herniations with radiculopathy, later confirmed by an MRI that disclosed multilevel degenerative changes in various regions of Breen's lower lumbar spine, including disk herniations at L2-L3 and L4-L5.

Between August and October of 2007, Breen visited several doctors for diagnosis and treatment of his worsening back pain, which had begun to radiate into his buttocks and right leg. Breen consulted Dr. Zach Broyer (a pain specialist), Dr. Steven Blazar (an orthopedic surgeon), and Dr. Susan Pollan (another pain specialist). Dr. Blazar diagnosed Breen with lower back degenerative disk disease and chronic lumbar syndrome of indeterminate etiology. Breen received several anti-inflammatory injections to alleviate his pain symptoms.

In late December, Breen presented to Dr. David Marcoux, his primary care physician, and complained of an acute worsening of lower back pain radiating down his left leg. Dr. Marcoux diagnosed Breen as suffering from sciatica and diminished left ankle reflex likely due to an L5-S1 radiculopathy. On January 8, 2008, Breen followed-up with Dr. Blazar and reported a worsening of symptoms and constant pain in his left leg. An MRI revealed a disk herniation at the L4-L5 region in which part of

3

the disk fragment was almost entirely free, and degenerative disk disease at L4-L5 and L5-S1. On January 17, 2008, Breen consulted Dr. Blazar regarding treatment options for his back pain, including surgery.

Breen's last day of full-time work at Sovereign was on January 18, 2008. On January 21, 2008, he underwent an L4-L5 disectomy to remove the free-disk fragment in his back. After the surgery, the pain in Breen's left leg improved and he returned to work part-time on February 4, 2008. However, after two weeks, the intense pain in Breen's right leg recurred. Breen left work permanently on February 22, 2008.[4]

On March 4, 2008, Breen returned to see Dr. Blazar. Breen reported constant pain in his right lower leg as well as newly developed pain in his left lower leg. Reviewing the results from a fresh MRI, Dr. Blazar diagnosed Breen with severe post laminectomy syndrome,[5] status/post excision HNP/fragment L4-L5, and left and multilevel lumbar degenerative disk disease from L4 to S1. On March 11, 2008, Dr. Blazar completed a Restrictions Form for Liberty stating that Breen's diagnosis was degenerated disk disease lumbosacral – no myelopathy.

---

[4] Breen applied for and received short-term disability benefits under a separate policy, which is not at issue in this case.

[5] Also known as failed back surgery syndrome, post laminectomy syndrome "refers to persistent pain or other symptoms following spinal surgery." *LaRose v. Astrue*, 2010 WL 4272824, at *10 n.5 (C.D. Cal. Oct. 25, 2010)

On March 8, 2008, Breen underwent an electromyograph (EMG)[6], the result of which was abnormal for both of his lower legs, and consistent with post-operative denervation or arachnoiditis.[7] Breen saw Dr. Blazar again on March 24, 2008, and reported no significant changes in his health. Based on the EMG, Dr. Blazar diagnosed Breen with post laminectomy syndrome, herniated disk lumbosacral – no myelopathy, and arachnoiditis. After this appointment, on March 31, 2008, Dr. Blazar completed a second Restrictions Form for Liberty that indicated that Breen suffered from post laminectomy syndrome lumbar and herniated disk lumbosacral.

In May, Breen consulted with Dr. Adetokunbo Oyelese, a neurosurgeon. Dr. Oyelese noted that Breen was experiencing greater pain in his right than his left leg. He also observed that Breen was presenting with low back pain and post laminectomy syndrome. Dr. Oyelese concluded that Breen's MRI results did not support a diagnosis of arachnoiditis. Dr. Oyelese ordered a CT myelogram[8] of Breen's lumbar spine, the result of which indicated "[m]ultilevel degenerative disk disease of the lumbar spine,

---

[6] Electromyography "[t]he recording of electrical activity generated in muscle for diagnostic purposes." Stedman's Medical Dictionary (27th ed. 2000).

[7] Arachnoiditis is "[i]nflammation of the arachnoid membrane often with involvement of the subjacent subarachnoid space." *Id.* The arachnoid membrane is one of three coverings of the central nervous system. *Id.*

[8] Myelography is "[r]adiography of the spinal cord and nerve roots after the injection of a contrast medium into the spinal subarachnoid space." *Id.*

most prominent at L4-l5 and L5-S1 without evidence of severe central stenosis or neural foraminal narrowing." AR00345. Breen also followed up with Dr. Blazar in May and June. Dr. Blazar assessed Breen as continuing to suffer from arachnoiditis, degenerative disk disease lumbosacral – no myelopathy, herniated disk lumbosacral, and post laminectomy syndrome lumbar.

On July 20, 2008, Breen's disability became eligible for LTD benefits under the Policy. In anticipation of Breen's LTD claim, Liberty obtained Breen's medical records and referred them to Dr. C. David Bomar, a Board Certified Orthopedic Surgeon, for a preexisting condition investigation. Dr. Bomar was asked to determine whether Breen had been treated for his primary diagnosis during the "preexisting period," that is, between May 1, 2007, through July 31, 2007. Dr. Bomar observed that Breen's primary disabling diagnoses included degenerative disk disease, post laminectomy syndrome, and possible arachnoiditis, but he concluded that Breen's "underlying condition of degenerative disk disease is basically responsible for his overall back condition." AR00299. He also determined that Breen had been treated for degenerative disk disease during the preexisting period by Dr. Ivill in July of 2007. Citing Dr. Bomar's review, on September 16, 2008, Liberty sent Breen a written denial of his LTD claim based on the preexisting condition exclusion in the Policy.

In October of 2008, Breen timely requested a review of Liberty's denial, and in

6

support, submitted an opinion letter from Dr. Blazar stating that the herniated disk and left-side pain that had led to Breen's surgery was not present during his initial office visit in September of 2007. Moreover, Dr. Blazar stated that Breen's post surgical conditions – arachnoiditis and status post excision of a free-fragment disk herniation – also were not present during the preexisting period. Liberty forwarded Dr. Blazar's letter to Dr. Bomar for review. Although Dr. Bomar largely agreed with Dr. Blazar's assessments, he nonetheless concluded that "[t]he degenerative disk disease for which the claimant was treated in July 2007 clearly contributed to and made more likely the subsequent development of the L4-5 disk herniation and surgery." AR00290.

In response to Breen's request for further review, Liberty referred Breen's claim and some additionally obtained medical files to its Appeals Review Unit. Liberty also sought an additional medical opinion from Dr. Gale G. Brown Jr., who is Board Certified in Physical Medicine and Rehabilitation and Internal Medicine. Dr. Brown was asked her opinion on whether Breen's disability as of January 21, 2008 – the claimed LTD onset date – was "caused, contributed to, by or resulting from a condition (injury or sickness) for which he received treatment (consultation, care, etc) during the period 5/31/07-7/31/07?" AR00245. After reviewing Breen's medical records,

7

including Dr. Blazar's assessments,[9] Dr. Brown agreed with Dr. Bomar that Breen's disability was caused by a preexisting condition because: (1) Breen was treated for degenerative disk disease in July of 2007; (2) the MRI performed at that time showed a L4-L5 disk herniation, which contributed to or caused the later L4-L5 herniation which required surgery; and (3) that disk herniation is a complication and consequence of disk degeneration. Dr. Brown agreed with Dr. Oyelese that the evidence did not support a diagnosis of arachnoiditis. Finally, Dr. Brown concluded that as of the onset date of January 21, 2008, Breen had no record of spinal surgery. Because lumbar post laminectomy syndrome is a complication of lumbar spine surgery, it was not a relevant disabling diagnosis at that time.

On January 19, 2010, Liberty informed Breen that his appeal had been denied based on Dr. Bomar's and Dr. Brown's review. In June of 2010, Breen, now represented by counsel, requested that Liberty process a second LTD claim with a new disability date of February 22, 2008 (the day he stopped part-time work), based on the diagnosis of post laminectomy syndrome. Liberty promptly denied the request explaining that because Breen "did not return to work for a period greater than 30 days, a new period of disability is not applicable to the LTD claim. The period that he

---

[9] Dr. Brown also spoke with Dr. Blazar via telephone to confirm his assessment of Breen's pre- and post operation conditions.

returned to work would have been accumulated to the elimination period." AR00073. Liberty reiterated that its "determination pertaining to Mr. Breen's LTD claim remains as outlined in our letter dated January 20, 2009." *Id.* In November of 2010, Breen filed this lawsuit.

## DISCUSSION

In the usual case, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The standard, however, is modulated in a denial of benefits case under ERISA. "In an ERISA benefit denial case, trial is usually not an option: in a very real sense, the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Leahy v. Raytheon Co.*, 315 F.3d 11, 17-18 (1st Cir. 2002). Therefore, "summary judgment is simply a vehicle for deciding the issue. This means the non-moving party is not entitled to the usual inferences in its favor." *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 517 (1st Cir. 2005) (citations omitted).

An ERISA denial of benefits case is reviewed de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*,

9

489 U.S. 101, 115 (1989). In those cases where the "benefit plan gives the administrator or fiduciary discretion to determine benefit eligibility or construe plan terms, *Firestone* and its progeny mandate a deferential 'arbitrary and capricious' standard of judicial review." *Recupero v. New England Tel. & Tel. Co.*, 118 F.3d 820, 827 (1st Cir. 1997) (citation omitted).

In this case, Section 7 of the Policy explicitly states that "Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding." AR00036. Because the plan unequivocally gives Liberty the discretion to construe terms and determine benefit eligibility, the arbitrary and capricious standard of review must be applied.[10]

---

[10] Breen does not dispute that the "arbitrary and capricious" standard is the correct standard of review. Instead, Breen contends that because Liberty wears dual hats as the payor and plan administrator, a structural conflict of interest arises that accords Breen the tie-breaking point in a close case. A structural conflict of interest is "one factor among many that a reviewing judge must take into account." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 116 (2008). However, the weight to be given to the conflict depends on the circumstances at hand. *See id.* at 117. Breen has not demonstrated that Liberty's dual roles had any actual influence on the decision to deny him benefits. If anything, it appears that Liberty took steps to mitigate any potential bias by referring Breen's medical records for review by an independent physician (Dr. Bomar) and further review by a second physician (Dr. Brown) commissioned by its appeals unit. *See id.* (A structural conflict "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias

Under the arbitrary and capricious standard,

> the administrator's decision must be upheld unless "arbitrary, capricious, or an abuse of discretion." This standard means that the administrator's decision will be upheld if it is reasoned and "supported by substantial evidence in the record." Evidence is "substantial" if it is reasonably sufficient to support a conclusion. Moreover, the existence of contradictory evidence does not, in itself, make the administrator's decision arbitrary.

*Vlass v. Raytheon Emps. Disability Trust*, 244 F.3d 27, 30 (1st Cir. 2001) (citations omitted). Thus, while arbitrary and capricious review is not to be wielded as "a rubber stamp," *Lopes v. Metro. Life Ins. Co.*, 332 F.3d 1, 5 (1st Cir. 2003) (citation omitted), "the hallmark of such review [is] that 'a court is not to substitute its judgment for that of the [decision-maker].'" *Terry v. Bayer Corp.*, 145 F.3d 28, 40 (1st Cir. 1998), quoting *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The merits of this case begin with the undisputed facts that Breen sought medical treatment for his chronic back pain within the Policy's preexisting period – the three months prior to August 1, 2007 – and that he received a diagnosis of degenerative disk disease of his lumbar spine. The disputed issue is whether Liberty acted unreasonably in folding Breen's post-operative disability into the Policy's preexisting condition exclusion. Liberty asserts that its decision was based on the opinions of two physicians

---

and to promote accuracy . . . .").

(Bomar and Brown) who were Board Certified in the relevant specialties.[11] They both concluded that Breen's disability was "caused or contributed to by, or result[ed] from" his preexisting degenerative disk disease. Because there is substantial medical evidence in the record supporting the doctors' opinion, Liberty contends that its decision could not, almost by definition, be found to have been arbitrary and capricious.

Breen, for his part, argues that Liberty's decision is unreasonable under controlling Pennsylvania law, which according to Breen, does not permit a preexisting conditions exclusion as broad as the "caused or contributed to by, or results from" exclusion incorporated in Liberty's LTD Policy.[12] Under Breen's interpretation of Pennsylvania law, an LTD insurer may only exclude a disability *that directly results from a preexisting condition*. He cites the following Pennsylvania regulatory language.

> (a) A preexisting condition limitation will not be approved [by the Commissioner of Insurance] for use with a policy or contract which is more restrictive than the following definition: A preexisting condition is a disease or physical condition for which medical advice or treatment has been received within 90 days immediately prior to becoming covered under the group contract. The condition shall be covered after the individual has been covered for more than 12 months under the group contract.

---

[11] In passing, Breen attacks the impartiality of Dr. Brown, who is employed by Liberty. He does not question the integrity of Dr. Bomar's opinion.

[12] The Policy states that its "[g]overning jurisdiction is Pennsylvania and subject to the laws of that State." AR0001.

> (b) Long-term disability benefit provisions may require that the total disability ***resulting from*** a preexisting condition commence after the individual has been covered for more than 12 months under the group contract.

31 Pa. Code § 89.402 (emphasis added). Breen's bottom line is that the "caused to or contributed by" language of the Policy should be disregarded, thereby only permitting exclusion of disabilities that directly "result from" preexisting conditions.

Consistent with his reformulation of the standard of causation, Breen argues that his disability diagnosis of post laminectomy syndrome did not directly result from preexisting degenerative disk disease, but instead from his less than successful back surgery, which occurred after coverage attached under the Policy. Under Breen's analysis, Liberty's stated reason for denying his LTD claim, that a preexisting degenerative disk disease led eventually to the need for back surgery, which in turn led to a post-operative disability, is too attenuated in a *Palsgraffian* sense to satisfy his "directly results" test.[13] Breen relies on *Fought v. Unum Life Ins. Co. of Am.*, 379 F.3d 997, 1011 (10th Cir. 2004), a case in which the Court found that the denial of LTD coverage for post-surgical complications under a preexisting condition exclusion

---

[13] Breen additionally argues that Liberty's denial is inconsistent with its own training materials, which require a "direct causal link" between a preexisting condition and an excludable disability. Liberty counters that while the training materials give examples of instances of direct causal relationship, they also provide guidance to claim managers in instances in which the disability is only related to the preexisting condition.

13

worded similarly to the one in Liberty's Policy was too causally removed to be reasonable.

In response, Liberty first points out that 31 Pa. Code § 89.402 is a relic of a bygone era when Pennsylvania required that insurance policies be pre-approved by the Commissioner of Insurance. *See* 31 Pa. Code. § 89.2. Pennsylvania deregulated the sale of group LTD insurance in 1996. *See* 26 Pa. Bull. 1453. Thus, according to Liberty, the regulatory language cited by Breen is no longer applicable. In the alternative, Liberty argues that the Policy's definition of a "pre-existing condition" – "a condition resulting from an Injury of Sickness for which the Covered Person is diagnosed or received Treatment within three months prior to the Covered Person's effective date of coverage" – is consistent with the definition under 31 Pa. Code. § 89.402(a), and substantially complies with requirements of 31 Pa. Code § 89.402. *See* 31 Pa. Code. § 89.404.

Although the court appreciates the parties' detailed supplemental briefing on this issue, it is not necessary for present purposes to decide whether Pennsylvania law either invalidates or narrows the scope of the Policy's preexisting condition exclusion.[14]

---

[14] Breen notes that 26 Pa. Bull. 1453 states that "[n]otwithstanding the deregulation of the [insurance] forms specified herein, all such forms must continue to comply with applicable Pennsylvania law." However, it is not altogether clear that the Commissioner's regulations remain "applicable law."

Even applying the "result[s] from" formulation advocated by Breen, the denial by Liberty of his LTD claim is supported by substantial evidence. Breen was consistently diagnosed by his treating physicians (Blazar and Oyelese) with degenerative disk disease, the general condition for which he was treated in the preexisting period, both before and after his back surgery.[15]

Moreover, although Breen did not manifest post-laminectomy syndrome during the preexisting period, it was not arbitrary or capricious for Liberty to have determined that the post-laminectomy syndrome resulted substantially from Breen's preexisting degenerative disk disease and disk herniations. Contrary to Breen's reading, the Pennsylvania regulation does not mandate ***direct*** causation; it requires only that the disability "result from a preexisting condition."[16] "The Supreme Court of Pennsylvania has interpreted the words 'resulting from' in an insurance contract as meaning proximate causation." *Cher-D, Inc. v. Great Am. Alliance Ins. Co.*, 2009 WL 943530, at *6 (E.D. Pa. Apr. 7, 2009). Proximate causation is a familiar concept in tort law, one that is intended to define the *legal cause* of a harm, separating those acts that the law deems too remote to trigger a duty of care from those that do. As applied to this case,

---

[15] Breen had also experienced right side pain, and a disk herniation at L4-L5 during the preexisting period.

[16] The word "directly" does not appear in the regulation as a qualifier of the word "results," but is instead added by Breen.

"[p]roximate cause does not exist where the causal chain of events resulting in [the] plaintiff's injury is so remote as to appear highly extraordinary that the [preexisting condition] could have brought about the [disability]." *Id.*, citing *Lux v. Gerald E. Ort Trucking, Inc.*, 887 A.2d 1281, 1286-1287 (Pa. Super. Ct. 2005). There is nothing "highly extraordinary" in the proposition that Breen's preexisting conditions resulted in his disability – Dr. Bomar and Dr. Brown both concluded that this was so.[17]

Breen's case is also distinguishable from *Fought*. In *Fought*, the claimant underwent an initial surgery to treat her preexisting condition of coronary artery disease. After a series of unfortunate medical events, she was forced to undergo a number of additional procedures to repair the initial wound, and was then found to have contracted a resistant staph infection (most likely from an unsterile hospital environment).[18] *Fought*, 379 F.3d at 1009-1010. The likelihood that Fought would have suffered a staph infection after "at least five intervening stages between the preexisting coronary artery disease and the disability" could easily be deemed to be "highly extraordinary." *Id.* at 1010. Breen, on the other hand, underwent back surgery

---

[17] It was not unreasonable for Liberty not to consider arachnoiditis as a disabling condition where Breen's own surgeon, Dr. Oyelese, did not find support for the diagnosis, an opinion in which Dr. Brown concurred.

[18] As Liberty points out, the Court in *Fought* also applied a "more searching and less deferential standard of review" than applies in an ERISA abuse of discretion context. *Fought*, 379 F.3d at 1008.

suffering lower back disk problems, and came out of the surgery suffering lower back disk problems. Under the circumstances, it was not unreasonable, much less arbitrary and capricious, for Liberty to have concluded that Breen's post-operative lower back disk problems were proximately caused by his preexisting lower back disk problems. *See Topazian v. Aetna Life Ins. Co.*, 2011 WL 3419375, at *8 (N.D. Ill. Aug. 1, 2001) (insurance company had sufficient evidence to conclude that plaintiff's preexisting degenerative disk disease and post laminectomy syndrome "were symptomatic of an ongoing disk disease affecting his lower back.").[19]

## CONCLUSION

For the foregoing reasons, Breen's motion for summary judgment is DENIED, and Liberty's motion for summary judgment is ALLOWED. The Clerk will enter judgment for Liberty and close the case.

SO ORDERED.

/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE

---

[19] Breen's filing of a second LTD claim does not alter the outcome because nothing had changed. While Dr. Bomar had concluded that Breen's post-laminectomy syndrome was a disabling condition, he had also determined that it was substantially caused by the preexisting degenerative disk disease. It was not, therefore, arbitrary or capricious for Liberty to deny the second claim on the same grounds as the first claim.

17